## WAGGONER BANKING CO. v. GRAY COUNTY STATE BANK.

(Court of Civil Appeals of Texas. Amarillo. March 7, 1914. On Motion for Rehearing, April 18, 1914.)

1. BILLS AND NOTES (§§ 129, 130*)—DEMAND AND SIGHT BILLS—"PAYABLE AFTER SIGHT."

A bill payable on demand is due, and action may be brought thereon, at once, without grace, and is payable on the day of its date, or within a reasonable time, while a bill payable at sight must be presented for acceptance before it can be enforced against parties collaterally liable, and is entitled to grace, since "payable after sight" means after acceptance or protest for nonacceptance, and not from a mere private exhibition to the drawee.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 283–292, 297–309; Dec. Dig. §§ 129, 130.*]

2. GUARANTY (§ 42*)—DRAFTS ON THIRD PERSON—CONDITIONS.

Defendant bank wired plaintiff bank that defendant would pay drafts on T. Grain Company, with bill of lading attached, drawn by R., and in confirmation thereof wrote a letter to the same effect, stating, however, that the drafts should be sent direct to defendant for payment or credit, and that defendant could not handle the drafts through other banks. Plaintiff thereafter cashed drafts drawn by R. on the grain company, but these were presented through other banks direct to the grain company and paid by it without any claim against defendant. The draft in suit was presented to the grain company, and payment refused after it had obtained possession of the grain represented thereby by means of authority obtained from R., after which the draft was presented to defendant for payment under the guaranty without bill of lading attached. Held, that the conditions attached to the guaranty were not waived by the previous method of transmitting drafts, and that, the conditions of the guaranty not having been complied with in the transmission of the draft in question, defendant was not liable.

[Ed. Note.—For other cases, see Guaranty, Cent. Dig. §§ 51, 52; Dec. Dig. § 42.*]

3. GUARANTY (§ 27*)—LIABILITY OF GUARANTOR.

The liability of a guarantor cannot be extended by implication beyond the actual terms of his engagement.

[Ed. Note.—For other cases, see Guaranty, Cent. Dig. § 28; Dec. Dig. § 27.*]

Appeal from District Court, Hemphill County; F. P. Greever, Judge.

Action by the Gray County State Bank against the Waggoner Banking Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Cook & Cook, of Vernon, for appellant. H. E. Hoover, of Canadian, and Ewing & Dial, of Miami, for appellee.

HUFF, C. J. This suit was instituted in Gray county, by the appellee, Gray County State Bank, against appellant, the Waggoner Banking Company, a private bank, and the individual copartners composing the firm the Texas-Oklahoma Grain Company, and J. C. Rider. Afterwards the venue was changed by agreement to Hemphill county, where the case was tried and final judgment rendered.

By amended petition appellee alleged, in substance, on and prior to July 8, 1910, the Texas-Oklahoma Grain Company, a corporation, was engaged in buying and selling grain in Gray county, Tex., and had J. C. Rider as its agent for that purpose. Rider purchased grain from producers, and shipped to said company when the shipments were ready, and drew drafts on his principal for the purchase price of the grain, and deposited same with appellee bank, which bank gave credit therefor, and forwarded the drafts to the grain company, to be paid through its bank, the appellant herein. In order to insure the prompt payment of such draft, and in order that the same might be sold to and handled by appellee, appellant wired appellee July 8, 1910, and on the same day confirmed the wire by letter, that it would pay drafts so drawn. By reason of the promise in the wire and letter, appellee thereafter cashed all drafts, and forwarded same to appellant for payment. That the agreement as finally consummated, and the mode and manner in which the business was transacted, was that J. C. Rider would purchase a car load of grain and give checks upon appellee, which appellee would cash, and when a car load was purchased Rider would ship to the grain company and draw a draft on the grain company for the amount, and attach thereto the bills of lading and a sworn statement of the number of bushels the car contained, or the number of pounds it contained; that the draft would then be deposited and credit given for the full amount of the same to the grain company by appellee, and by it forwarded through its correspondent to appellant, and that appellant, after said date, honored various and divers drafts so drawn and forwarded for payment. In accordance with the agreement and the mode and manner theretofore pursued, on July 30, 1910, with bill of lading attached, Rider drew a draft for the sum of $674.50, which was cashed by appellee, and at once forwarded in due course of business to appellant for payment, which was duly presented for payment, but appellant refused to pay the same; that the draft was protested at an expense of $5 protest fees, which appellee was required to pay. If the correspondence should be found susceptible of a construction other than the liability of appellant to become bound to pay the draft, then appellee alleged that such was relinquished and modified and of no effect, by reason of the fact that at all times previous appellant paid drafts drawn and identical with this draft, forwarded and presented the same way, but for which the draft sued on would not have been paid. It was also alleged the grain company was insolvent and had gone out of business, and that J. C. Rider's guaranty was of no avail. The appellant bank answered by general denial, and specially that by the undertaking of appellant the drafts drawn by appellee were to be sent to appellant for collection and remittance, with bill of lading attached, and the same would not be paid if sent through other banks, and that the agreement relied upon by appellee permitted drafts drawn "at sight," and not drafts drawn "on demand," and that its undertakings were for the accommodation of appellee and the Texas-Oklahoma Grain Company, and without any consideration; that it advised appellee it would pay drafts on demand when certain conditions were complied with, and would pay such drafts at sight on certain other conditions. The draft in question was drawn on demand, without complying with the conditions required; that these conditions so required were for the purpose of protecting itself, holding the grain as security for any money it might advance in paying the draft. Appellee knew this fact. The grain for which the draft in suit was given was turned over to the grain company by Rider before the draft was presented to appellant without its knowledge or consent. Trial was had before the court without a jury, and without findings of fact or conclusions of law filed in the case, the trial court rendered a judgment in favor of J. C. Rider, and in favor of appellee bank, against appellant bank, for the sum of $803.35. The case was dismissed against the Texas-Oklahoma Grain Company because of its insolvency. Appellant appeals from this judgment.

The facts show that J. C. Rider bought wheat in Gray county as the agent of the Texas-Oklahoma Grain Company, and that previous to the draft in question had bought and paid for, by drafts of a like kind, 20 cars of wheat. On this draft appellee paid Rider the money, which was for the use and benefit of the grain company. The draft is as follows: "$674.50. Pampa, Texas, July 30, 1910. No. 21. On demand, pay to the order of Gray County State Bank, six hundred, seventy four and fifty/100 dollars, with exchange, value received, and charge to account of [Signed] J. C. Rider. To Texas-Oklahoma Grain Co. Vernon, Texas. The Waggoner Banking Company—Customer's Draft." This draft was protested August 3, 1910, fees of protest $5. The appellee indorsed it, and sent it through the Amarillo National Bank to the First National Bank of Ft. Worth, which bank indorsed it and sent it to the Herring National Bank of Vernon, Tex., which bank presented it for payment to the Texas-Oklahoma Grain Company. Payment was refused, and upon refusal it was protested for nonpayment. The evidence of Rider is there was an account attached to the draft, setting out the number of bushels and price. The account does not appear to be made out to any one or by any one. All the places for names are blank. It gives the car No. A. T. 20209, and the number of bushels 783, price 87½ cents.

There is an affidavit by J. C. Rider, in which he swears "that the wheat loaded in car No. 20209, A. T. at Pampa, Texas, July 28, 1910, weighed 46820 lbs." The bill of lading gives number of car and weight the Texas-Oklahoma Grain Company as the consignee, and destination Vernon, Tex., dated July 29, 1910.

The testimony of the cashier of appellee, Mr. Crawford, is to the effect that he had paid the money out to Rider for the grain company, and that he would not have done so without the telegram and letter from appellant; that he paid to Rider, and received some 15 or 20 drafts from him previous to the one in question, with like affidavits and bills of lading attached, and sent them in the same way and through the same channels, and that none of them had been refused payment, and no objection had ever been urged to the manner of sending them. He did not know how the previous drafts had been paid; whether appellant or the grain company had paid them. He further testified there was no other contract made between appellant and appellee, except such as were contained in the letters. The facts show that J. C. Rider wired the railroad station agent at Vernon, Tex., to release the car of wheat to the grain company. This wire was sent in response to a request from the grain company for a release, on the ground that demurrage was being charged against the car. This wire appears to have been sent on August 8, 1910, when the car was released to the grain company. The agent turned the car of wheat over to the grain company, and that company did not turn it or the proceeds over to appellant bank, but credited J. C. Rider's account therewith, claiming that he was indebted to it on account of shortage in weight and grades on previous shipments. The grain company was and is insolvent and has suspended business. The draft was not presented to appellant bank, and demand made for payment, until after the car of wheat had been disposed of as above set out.

The vice president of appellant bank testified: When the draft was presented to appellant for payment, it had attached to it only the bill of lading, and that its payment was refused because the wheat tickets and affidavits were not attached, as required by his letter, and because it was not sent to appellant for collection and remittance, and because the wheat had been disposed of before it was presented to the bank for payment. This witness further testified that this was the first draft that had been presented to it for payment, and that it had not paid such drafts previously sent, and had no knowledge that such drafts were being paid by the grain company. This witness further explained that in his first letter, "that the drafts were to be sent on our bank with bill of lading attached. The reason I made the second proposition was in reply to the letter from plaintiff attached as Exhibit C, in which it requests that defendant banking company write them about paying drafts drawn on demand. The drafts theretofore having been drawn at sight, it gave time for wheat to come in and be inspected, while when drawn on demand, we did not have any time, but had to pay for the wheat before we could inspect it, and hence we required the tickets and affidavit to be attached to demand drafts, together with the bills of lading so as to protect the bank. The telegram related to sight drafts as per letter from plaintiff July 9, 1910."

The following telegram and letters were introduced in evidence:

"Vernon, Texas, 7/8/10. To Gray County State Bank, Pampa, Texas. Will pay drafts on Texas Oklahoma Grain Co. with bill lading attached drawn by J. C. Rider have written. Waggoner Banking Co."

"Vernon, Texas, July 8, 1910. Gray County State Bank, Pampa, Texas—Gentlemen: We to-day sent you telegram in answer to yours of even date as follows: 'Will pay drafts on Texas-Oklahoma Grain Co. with B/L attached drawn by J. C. Rider have written.' We wish to take up the matter handling these drafts with you and see if we cannot improve on the way we handled them last year. Our suggestion is this, that you send the drafts of this company direct to me for your credit and advise, in other words, open an account with us for the grain season, we will credit your account on receipt of same and allow you the usual two per cent. on your daily balances with us. We suggest this because we are handling other grain accounts in this way and it has proven the most mutually agreeable and profitable plan that we have ever had. However, if you prefer to just send these drafts for collection and remittance, it will be all right, but it works a hardship and so much inconvenience to have them come through the other banks here that we cannot handle them that way, and it also often costs these folks double exchange. Kindly let us hear from you in reference to this point. We think you will be very much pleased with the plan first suggested, it will save you every cent of interest and so much less delay connected with it. Yours very truly, E. P. Hicks. V. P."

"Gray County State Bank. Pampa, Texas, July 8, 1910. Waggoner Banking Co., Vernon, Texas—Gentlemen: Will you pay J. C. Rider's drafts drawn on the Texas-Oklahoma Grain Co. with bill of lading attached, these drafts will be for grain and drawn at sight. This is to confirm your wire of the 8th inst. Yours truly, J. T. Crawford, Cashier."

"Gray County State Bank. Pampa, Texas, July 14, 1910. Texas-Oklahoma Grain Co., Vernon, Texas—Gentlemen: We have been paying J. C. Rider's checks for grain and accepting sight drafts on you for him;

after this we will have to ask that he make drafts payable on demand, as we will want to handle them as cash items, this was the arrangement made by your Mr. Bird when he was here. Please have your bank write us that they will take care of drafts drawn on demand. Wire us if this is not satisfactory. Yours truly, J. T. Crawford, Jr., Cashier."

"July 16, 1910. Gray County State Bank, Pampa, Texas—Gentlemen: With reference to paying drafts drawn for wheat by J. C. Rider on Texas-Oklahoma Grain Company, will say that all of these drafts that have B/L wheat tickets and affidavits attached, and that the amount drawn for in draft corresponds with the number of bushels of wheat represented by such tickets B/L and affidavits at the prices authorized by Texas-Oklahoma Grain Company, will be promptly paid for here and there will not be any trouble about this whatever where these conditions are complied with. I do not see how that we could make any other statement in connection with the paying of these drafts, that should be more satisfactory to you than this. We shall however be glad to hear from you further if you think necessary on any point in connection with the matter. Yours very truly, E. P. Hicks, V. P."

"Pampa, Texas, Aug. 4, 1910. Texas-Oklahoma Grain Co., Vernon, Texas—Gentlemen: Replying to yours of the 3rd inst. I wired the Herring Nat'l Bank upon receipt of your message to Rider waiving protest of the $674.50 item. You say that it works a hardship on you to have these drafts come through any bank by the Waggoner Banking Company they have all been marked through that bank and if you are to accept them and let your bank take them up when they clear with the other banks I do not think you would have to pay any exchange on them or that it would make it any harder on you than if they were sent direct if they were sent as a cash item, we are compelled to handle these drafts as any other cash item and the banks we sent to use them as such. On July the 12th we sent one of Rider's drafts that he had marked without exchange direct to the Waggoner Banking Co. and they charged us $2.20 exchange. This was draft No. 2 for $893.25. We are having a rainy spell and all the threshing has stopped here and practically no wheat coming so I hope you will get caught up and that our dealing go along as before, which has been very satisfactory up to now, with us. Yours truly, J. T. Crawford, Cashier."

[1] A bill payable on demand is due, and action thereon may be brought, at once. Henry v. Roe, 83 Tex. 446, 18 S. W. 806; Paine v. R. R. Co., 118 U. S. 152, 6 Sup. Ct. 1019, 30 L. Ed. 193. Under the law merchant such paper is not entitled to three days of grace. Our Supreme Court held our statutes do not change that rule. Brown v. Chancellor, 61 Tex. 437. The bill is payable on the day of its date, or within a reasonable time. It is held in this state, and given as the rule by text-writers, when such instruments are so payable, it is not necessary to present them for acceptance (Carson v. Russell, 26 Tex. 453; 1 Dan. Neg. Inst., § 454); but, if payable at sight, the law requires it to be presented for acceptance before it can be enforced against parties collaterally liable (1 Dan. Neg. Inst. § 453). Three days of grace are allowed upon bills payable at sight, this is the rule recognized by a majority of our courts. 1 Dan. on Neg. Inst. §§ 617–618. A bill payable after sight means after acceptance or protest for nonacceptance, and not from a mere private exhibition to the drawee. 1 Dan. Neg. Inst. § 619.

[2] There can be no question from the telegram of July 8th, and the letter of that date from appellant to appellee and the letter from appellee to appellant of the same date, that the drafts should be drawn at sight. Appellee clearly indicates that was its understanding by its letter of July 14th to the grain company, and in that letter requested the privilege of drawing payable on demand. We think the draft as drawn, the understanding of all parties as disclosed by the testimony, as well as the letters in evidence, made a contract of guaranty by appellant. The grain company was the primary debtor; the wheat was bought by and for that company; the money was advanced to that company's agent by appellee upon a draft drawn on the grain company in favor of appellee. The entire credit was not given to the grain company, but was also given upon the agreement by appellee that the drafts would be paid. From July 8th, until July 16th, the appellant guaranteed the drafts if drawn at sight with bill of lading attached, and if sent to appellant for "collection and remittance," and if sent for collection through any other bank in the town, appellant could not handle the drafts sent in that way. This was the condition of appellant's guaranty contract, and a compliance therewith was required in order to render it liable. On the 16th of July, the parties agreed to change the form of the drafts to one "on demand," but appellant annexed as a further condition that "these drafts that have B/L, weight tickets and affidavit attached and that the amount be drawn for in the draft corresponds with the bushels of wheat represented by such tickets B/L and affidavits at the price authorized by the Texas-Oklahoma Grain Company will be promptly paid for here and there will not be any trouble about this whatever when these conditions are complied with." These last letters we do not think abrogate the contract as evidenced by the original letters, but change the contract from sight to demand drafts, with additional papers attached to the drafts. The appellee bank bases its right of recovery upon the original letter of appellant and its telegram of July 8th. There can be no question that,

as a condition to appellant's liability, that contract required the draft and bill of lading to be sent to it for its protection. This was required, doubtless, to prevent the very thing that did occur in this case. Had appellee sent this draft to appellant, the car of wheat could and would have been held and applied to the payment of the draft, and neither party would have lost anything.

The appellee must have understood that it was the purpose of appellants in having the draft and bill of lading sent to it for collection that such requirement was to protect itself on its guaranty of the draft. If the grain company could not pay it, then under the transfer of the bill of lading, appellant could sell the wheat and reimburse itself. This was a condition precedent to its liability on the guaranty. The failure of the appellant to comply with the terms of the contract in sending the draft to other bankers, with bills of lading, who presented it to the grain company for payment, and in not calling appellant's attention to the same, gave the grain company time to dispose of the wheat. After the evil had been done, the draft was presented to appellant for payment. It is then claimed that the tickets, bills of lading, and affidavits were attached. This was the first time appellant's attention was called to the draft. This certainly was not a compliance with either the first or second letters. This was not an unconditional guaranty, or a letter of credit, but the conditions upon which appellant would guarantee the payment of the drafts were specifically stated and set out, whether at sight or on demand, and in both instances must be collected and remitted through appellant bank. If appellant had intended to guarantee drafts unconditionally, it was useless to require the identity of the wheat by tickets and affidavit, and the conveyance by the bill of lading attached. In violating this contract appellee has lost the wheat as a security for the debt, and we do not think, after such loss, should then present the draft with the required papers attached, and claim this to be a compliance with the terms of the contract. The cashier of appellee admits he understood that appellant required the bill of lading as a security to it, and that such was customary with banks. This was not a contract on the part of appellant to accept a draft drawn on it, and in that is unlike the case of Henrietta National Bank v. Bank, 80 Tex. 648, 16 S. W. 321, 26 Am. St. Rep. 773, cited by appellee. It is only a guaranty that the drafts will be paid when drawn on the grain company, but to this was annexed a condition with which appellee should comply.

[3] It is urged that the draft was forwarded in the usual course of business through appellee's correspondence. Appellant did not stipulate that the draft should be so forwarded, but expressly stated that it could not handle the drafts unless sent direct to it for collection and remittance. That was part of the guaranty. The liability of a guarantor cannot be extended by implication beyond the actual terms of his engagement. The case must be brought strictly within the terms of the guaranty. Smith v. Montgomery, 3 Tex. 199; Lockwood v. Bronson, 53 Tex. 523; Irion v. Eskrigg, 30 Tex. Civ. App. 466, 70 S. W. 779; Lane v. Scott, 57 Tex. 367; Gardner v. Martin, 76 Tex. 25, 13 S. W. 39. It is contended that appellant waived the manner of drawing the drafts and sending the same for payment. The evidence simply shows that appellee drew this draft with attached papers as it had others, and the same had been paid theretofore without objection. These drafts were drawn on the grain company, which had theretofore paid the same. One or two were sent to appellant, and the bills of lading were attached, and the grain company paid them. As to others, it knew nothing of them. We do not think there is any testimony showing waiver of the condition of the contract by appellant bank. So long as appellee chose to rely on the grain company, and not appellant's contract of guaranty, appellant had no right to object. It cannot be charged with waiving the terms of its contract when it had not been called upon to do so or to act.

We do not think the facts in this case made a case against appellant under the contract alleged and proven, and the trial court should have rendered judgment for appellant. This court will render judgment that appellee take nothing by its suit against appellant, and that appellant recover its costs in this court and in the court below.

Reversed and rendered.

### On Motion for Rehearing.

The appellee asserts in its motion for rehearing that the draft in question was presented for payment July 28, 1910. If it was presented on that date, it was before it was ever drawn. It is dated July 30, 1910. It is again asserted that it was drawn on the appellant bank. This is based on the fact that it is addressed to Texas-Oklahoma Grain Co., Vernon, Texas, signed, "J. C. Rider," and beneath this is the following: "The Waggoner Banking Company, Customer's Draft." This draft was protested August 3, 1910. There is not the slightest evidence that we can find that it was ever presented to appellant bank for payment before protest; but the testimony is without controversy that payment was not demanded until after protest, and not until the grain company had obtained the wheat from the railroad company by virtue of a wire from Rider. The only circumstance that can in any way show appellant knew about this draft before protest and the disposition of the wheat is that the grain company and the Waggoner Banking Company were doing business in the same town. The appellee says there is no evidence that it accepted the conditions in the letter of July 8th. It pleaded the tele-

gram and the letter as the contract upon which it relied for recovery and introduced both in evidence to prove its case.

It is expressly stated in the letter that, to send drafts through other banks, it, appellant, could not handle them that way. Crawford, appellee's cashier, says that if appellant was obligated to pay the draft in question, it was by virtue of these letters. Crawford swears that about the 9th or 10th of August, 1910, he sent the draft to appellant. This was after the draft had been protested, and after the railroad company had released the wheat to the grain company on the telegram of Rider. When appellant got the draft and bill of lading, the railroad had parted with the possession of the wheat on the direction of the consignor to the consignee. This delay and the failure of appellee to comply with the conditions of appellant's guaranty defeated appellant's undertaking. It is insisted that Rider had drawn other drafts which had been paid. Crawford again testified: "I do not know whether or not any of those drafts I had drawn prior to that had been sent by me direct to the Waggoner Banking Co. I do not know but what they had all been presented down there by the Herring National Bank, or some other banks, to the Texas-Oklahoma Grain Company, and they paid it. All I know is I got the money. All I know is I drew the drafts and sent them through the Amarillo or some other correspondent, and they would go off and the money would come back to me." Mr. Hicks, the vice president of appellant, testified that former drafts were not sent to his bank for collection, or to present for payment to the grain company. This would not estop appellant from setting up and relying on the terms of its guaranty as evidenced by the letters. We think the appellee's own testimony shows the scale tickets were not attached to the draft in question in accordance with its letter of July 16, 1910. Appellee recalled J. C. Rider to prove: "Prior to the time of the drawing of this draft in controversy, I had never attached scale tickets to any drafts. It had not been required. It was called for at one time, but I cannot remember the time. It was after this draft was drawn." He further testified there was no public weigher at Pampa; there were several scales in town, and it was left optional with the farmer who should do the weighing. "They issued tickets for it." Appellant's testimony is positive that none of the things, except the bill of lading, were attached to the draft when sent to it. As heretofore set out, there were no scale tickets attached, so we think neither of the letters were complied with as to the conditions. Under the authorities cited in the original opinion, the terms of a contract of guaranty must be strictly performed. It is a hardship on appellee bank to lose the money, and so it would be for appellant to pay it. Appellee has seen proper to follow its own course, regardless of the stipulations and requirements by appellant that in sending and drawing the draft it should be done in a certain way, and, having taken the risk, it should abide the consequences.

The motion for rehearing is overruled.